UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   17-80013-CR-MIDDLEBROOKS/BRANNON

UNITED STATES OF AMERICA

v.

FRANSESIA DAVIS,

    **Defendant.**
_____/

### FACTUAL PROFFER

    Defendant Fransesia Davis, her counsel, and the United States agree that, had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt, and that the following facts are true and correct and are sufficient to support a plea of guilty:

    1.    At all times relevant to the Indictment, substance abuse treatment was regulated under state and federal law. Pursuant to Florida's Marchman Act, appropriate substance abuse treatment needed to be "a professionally directed, deliberate, and planned regimen of services and interventions that are designed to reduce or eliminate the misuse of drugs and alcohol and promote a healthy, drug-free lifestyle." Fl. Stat. 397.311(a).

    2.    At all times relevant to the Indictment, the Marchman Act made it unlawful for any person or agency to act as a substance abuse service provider unless it was properly licensed. Fl. Stat. § 397.401(1); Fl. Admin. Code § 65D-300.003(1)(a).

    3.    To insure the legitimacy of substance abuse service providers and to protect the health and welfare of patients, all substance abuse service provider personnel, including all owners, directors, and chief financial officers, had to pass a "level 2 background screening," including "fingerprinting for statewide criminal history records checks through the Department of Law Enforcement, and national criminal history records checks through the Federal Bureau of Investigation." Fl. Stat. §§ 397.451(1)(a)(1), 435.04(1)(a). The Act also made it a criminal offense to operate or attempt to operate as a service provider with personnel who did not pass the background test. Fl. Stat. § 397.403(1)(e)(1); 397.461. Despite these laws, the substance abuse treatment centers mentioned in the indictment, Journey to Recovery ("Journey") and Reflections Treatment Center ("Reflections"), applied for and received licenses and operated as service providers by hiding the fact that co-defendant Kenneth Chatman, who had a prior federal felony conviction, owned Journey and Reflections and was their Chief Operating Officer.

    4.    Reflections was located at 5100 Coconut Creek Parkway, Margate, Florida, in

Broward County, in the Southern District of Florida. Reflections purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction. As noted above, although co-defendant Kenneth Chatman had a federal criminal conviction that prohibited him from owning or operating a substance abuse service provider, Chatman owned and served as the Chief Operating Officer of Reflections, including making all financial decisions. The defendant knew that co-defendant Laura Chatman's name was used on all licensing and corporate documents for Reflections because co-defendant Kenneth Chatman could not own or operate Reflections.

5. Journey was located at 7451 S. Military Trail, Lake Worth, Florida, in Palm Beach County, in the Southern District of Florida. Journey purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction. As noted above, although co-defendant Kenneth Chatman had a federal criminal conviction that prohibited him from owning or operating a substance abuse service provider, Chatman owned and served as the Chief Operating Officer of Journey, including making all financial decisions. The defendant knew that co-defendant Laura Chatman's name was used on all licensing and corporate documents for Journey because co-defendant could not own or operate Journey.

6. The Patient Protection and Affordable Care Act of 2010 ("ACA"), Pub. L. 111-148, and other federal laws expanded the availability of private insurance to pay for substance abuse treatment in several ways. First, the ACA allowed parents to maintain health insurance for their children through their own insurance policies until the children reached the age of 26. Second, federal law mandated that substance abuse treatment and other mental health treatment must be covered and reimbursed by insurance policies in the manner and at the same levels as other medical treatment. Third, the ACA required insurance companies to cover individuals regardless of prior existing conditions. Fourth, annual and lifetime caps on coverage were removed. Fifth, the ACA created insurance exchanges that allowed uninsured individuals to apply for and obtain coverage from private insurers. The combination of these provisions created insurance coverage for patients and substance abuse treatment that had previously been excluded from coverage. Federal health care benefits programs were likewise expanded.

7. These federal laws created access to coverage through a number of avenues, including health plans sponsored by private employers, federal health care benefits programs, and health plans offered directly by private insurance companies. Private insurance companies administer health plans sponsored by private employers and governmental employers. Health plans sponsored by private employers are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, while those sponsored by governmental employers and certain others are exempted from ERISA's jurisdiction.

8. The Federal Employees Health Benefits Program ("FEHBP") provided medical benefits, items and services to federal employees and their dependents, including substance abuse services. The United States Office of Personnel Management ("OPM") managed the FEHBP and contracted with various insurance companies to offer these benefits. FEHBP reimbursed those insurance companies out of government funds for the money the insurance companies paid out for medical benefits, items and services for federal employees and their dependents.

BlueCross/BlueShield (BCBS) was one of the various insurance companies contracted by the Office of Personnel Management to offer medical benefits, items and services to federal employees under the FEHBP.

9.  The National Railroad Passenger Corporation, doing business as Amtrak ("Amtrak"), was a private, for profit, Government corporation, that operated a nationwide system of passenger rail transportation. As part of its employee benefits package, Amtrak established employee health and welfare benefit plans to provide healthcare to their employees, including their spouses, domestic partners, and dependent children (collectively, "dependents").

10. Both ERISA and non-ERISA health benefit plans, including ACA plans, were offered or administered by private insurance companies, including Blue Cross/Blue Shield, Aetna, Cigna Behavioral Health, Cigna Health & Life Insurance Company, United Behavioral Health, and United Health Group.

11. All of these health benefit plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is, "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

12. Regardless of the type of plan held by a patient, the amount of coverage and terms and conditions of billing and payment were governed by the terms of the individual's insurance documents, and the insurance company administering the plan had the authority, responsibility, and discretion to make coverage determinations and to process and make payments on claims.

13. Chapter 817 of the Florida Statutes, known as the "Florida Patient Brokering Act," made it a felony for any person, health care provider, or health care facility, including any licensed substance abuse service provider, to: "(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; (c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c)." Fla. Stat. § 817.505.

14. Florida law also stated that it "shall constitute a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge." Fla. Stat. § 817.234(7)(a).

15. Under state and federal law, health benefit plans were only responsible for claims for services that: (a) were "medically necessary," (b) were actually rendered; (c) were provided by a

properly licensed service provider, and (d) complied with the terms of the health care plan, including the obligation to pay co-insurance and deductibles.

16. Bodily fluid testing could be used to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva. Urine Analysis or urinalysis ("UA") testing complexity ranged from screening tests – also known as point of care ("POC") testing – which provided instant results, to confirmatory testing, which was sent to a laboratory, for more complex analysis. Laboratories could also conduct complex analysis on blood and saliva samples.

17. Like other medical tests, bodily fluid testing could be billed to insurance and reimbursed pursuant to the terms of the insurance policy. Insurance companies were only responsible for claims for testing that were "medically necessary," actually performed, prescribed, and conducted by a properly licensed service provider, and conducted and billed in compliance with the terms of the health care plan, including the obligation to pay co-insurance.

18. POC urine testing involved collecting a client's urine in a specific cup designed for testing. The specimen was analyzed using a color banded or numbered dipstick, allowing for visual positive or negative results. POC urine testing usually tested for the presence of 9 to 13 specific types of drugs, including the most common drugs of abuse like cocaine, opioids, and heroin. POC tests typically cost between $5 and $10 and could be read easily by a layperson.

19. Confirmatory testing, conducted in a laboratory setting, made use of gas liquid chromatography, mass spectrometry, and/or gas chromatography, or high performance liquid chromatography, to analyze the client's urine, blood, or saliva specimen. These techniques were highly sensitive, and accurately and definitively identified specific substances and the quantitative concentrations of the drugs or their metabolites. Confirmatory testing could detect a wider range of controlled substances and metabolites – up to 100 or more substances, referred to as "panels." The prescribing physician could request that the lab test only for those panels that directly related to a client's drug use history. Laboratories billed each panel separately, so prescribing more panels for testing resulted in higher bills.

20. Defendant Fransesia Davis was a nominee owner and operated a series of "recovery residences," also known as "sober homes," under the business name "Total Recovery Sober Living, LLC" ("Total Recovery"). One of the Total Recovery sober homes was located at 3401 Westview Avenue, West Palm Beach, Florida, in the Southern District of Florida. Although Davis' name appeared on business incorporation documents and utility bills, Kenneth Chatman ("Chatman") was the true owner of Total Recovery. Chatman and Davis agreed to place Davis' name on Total Recovery documentation as the owner in an attempt to hide Chatman's true ownership and control over the business.

21. In addition to acting as the nominee owner of Total Recovery, Davis was also an employee at Reflections and Journey. Her job duties including driving a van that transported patients from Total Recovery and from other sober homes in the Palm Beach County and Broward County- areas to Reflections and Journey. Davis was aware that Chatman paid kickbacks to other sober home owners in exchange for each insured patient that they referred to Reflections and Journey. Davis was aware that Chatman attempted to disguise these kickbacks and bribes as "case management fees".

22. Davis and Chatman agreed to pay kickbacks and bribes to Davis' insured residents in the form of reduced cost or free rent. These kickbacks and bribes were to induce the insured patients to reside at the defendant's sober homes and attend treatment at Reflections and Journey, so Chatman and Davis could continue to bill the patients' insurance companies.

23. The defendant was aware that the residents of her sober homes were continuing to use controlled substances and that her sober homes were not, in fact, places where persons abstained from the use of drugs and alcohol. Rather, the defendant allowed her sober homes to be used by residents to continue abusing drugs and alcohol while attending ineffective and improperly licensed treatment centers in exchange for free rent.

24. The defendant was aware that the salary that Chatman was paying to her were from fraudulent insurance billings generated from the substance abuse treatment and testing that Reflections, Journey, and a number of labs were submitting to residents' insurance companies.

25. The defendant was aware of many instances where the sober home residents did not attend the purported treatment sessions at Reflections and Journey and did not provide bodily fluid samples for drug testing. On some of these occasions, defendant, Davis and other co-conspirators would forge patients' signatures on sign-in sheets to make it appear as though absent patients had attended treatment and submitted bodily fluids samples.

26. Defendant, Davis, would also on occasion provide samples for the absent patients that were then submitted for testing and billing to the various laboratories utilized by Reflections and Journey.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 2/15/2017    By: _____
                        A. MARIE VILLAFAÑA
                        ASSISTANT UNITED STATES ATTORNEY

Date: 2/15/17      By: _____
                        NELSON M. MARKS, ESQ.
                        ATTORNEY FOR DEFENDANT

Date: 2-15-17      By: _____
                        FRANSESIA DAVIS, DEFENDANT